IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GARY NABORS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 19-CV-06877 ) |
| CITY OF NORTH CHICAGO, a Municipal Corporation, OFFICERS LARACUENTE, Badge #59, and MUELLER, Badge #76, | ) Judge John J. Tharp, Jr. ) ) ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM OPINION AND ORDER**

This is an action under 42 U.S.C. § 1983 against two police officers employed by the City of North Chicago. The Second Amended Complaint (or "SAC"; the operative complaint) alleges the police officers used excessive force while arresting the plaintiff in violation of the Fourth Amendment to the Constitution of the United States. The case proceeded to a one-day bench trial on September 20, 2021, at which the Court heard testimony from the plaintiff, both defendant police officers, and a third police officer present at the arrest.

Here, the Court sets forth its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). The Court's factual findings are based on police body camera video recording, testimony, and documentary evidence presented at trial, at which the Court had the opportunity to observe and evaluate the credibility of the witnesses. On the basis of the findings of fact and conclusions of law set forth in the discussion below, the Court enters judgment for the defendants.

**FACTUAL BACKGROUND**

Plaintiff Gary Nabors is a 57-year-old,[1] African American resident of North Chicago, Illinois. On the afternoon of September 3, 2018,[2] Mr. Nabors was driving his stepdaughter's Chevrolet Impala sedan on 14th Street when Defendant Officer Christopher Mueller executed an investigatory traffic stop. According to Officer Mueller, he observed Mr. Nabors driving repetitively throughout a high-crime neighborhood.[3] Mueller Body Camera ("Jt. Ex. 1") at 4:37:25–4:39:55, 4:45:20-38.[4] Both Officer Mueller and Mr. Nabors came to a stop in a liquor store parking lot. Shortly after, Officer Tremaine Nixon and Defendant Officer Juan Laracuente, both North Chicago police officers, arrived on scene.[5]

Upon initial questioning by Officer Mueller, Mr. Nabors falsely identified himself by providing the name and birthdate of his brother, Willie Payne, Jr., as his own. Jt. Ex. 1 at 4:37:49–4:38:07. Mr. Nabors also claimed to be on his way to chemotherapy and complained the investigatory stop was harassment. Jt. Ex. 1 at 4:37:30–4:40:16; Nixon Body Camera ("Jt. Ex.

---

[1] At the time of the incident.

[2] The SAC erroneously alleges that the traffic stop occurred on September 2, 2018. SAC ¶ 6, ECF No. 26.

[3] At trial, Officer Mueller offered an additional justification. Officer Mueller testified as to having observed and subsequently ticketed Mr. Nabors for driving in excess of the speed limit for North Chicago alleyways. However, no corroborating evidence of that citation was presented. *But see* Nixon Body Camera at 4:43:49-51 (To two, uninvolved responding officers, Officer Tremaine Nixon explains, "He was going through the alley; flying."). Alternatively, Mr. Nabors claims the traffic stop was harassment and the result of racial profiling. Jt. Ex. 1 at 4:37:25–4:39:55, 4:53:10. To be clear, the plaintiff has not asserted a claim challenging the lawfulness of the stop. Accordingly, that question is not relevant to the question of whether Officers Mueller and Laracuente used excessive force to effectuate Mr. Nabors' arrest.

[4] All citations to body camera video are based on the GPS timestamp embedded in the video (upper right corner). The Court's citations convert that time stamp into local time by subtracting five hours from the indicated GPS time (reflecting a five-hour difference between Greenwich Mean Time and Central Daylight Time).

[5] Mr. Nabors originally named Officer Nixon as a defendant but dismissed him from the suit shortly before trial. ECF Nos. 69, 71.

2

3") at 4:40:13-17 ("I'm on my way to my damn chemo . . . ."). Later, Mr. Nabors reemphasized his chemotherapy treatment as an implicit explanation for why he (aged 57 at the time) appeared older than 44 years (the age Mr. Nabors provided to Officer Mueller). Jt. Ex. 1 at 4:42:16-23 ("I've been going through chemo for the last eight years, mister."). Medical records admitted into evidence, however, do not indicate that Mr. Nabors had cancer or was undergoing chemotherapy treatment. *See* Pl. Ex 1 at 5; Pl. Ex. 2 at 1-3. When asked at trial about where he was going to receive chemotherapy, Mr. Nabors denied that he told the officers that he was personally undergoing chemotherapy treatments, claiming instead (and unpersuasively) that his statement that he was on his way to chemotherapy meant he was on his way to take a relative to their appointment. Mr. Nabors offered no similar alternative interpretation, however, for his statement claiming he had been undergoing chemotherapy treatment for eight years.

After relaying Mr. Nabors' putative identification to dispatch, Officer Mueller asked Mr. Nabors for proof of auto insurance. In response, Mr. Nabors leaned over the Impala's center console and extended his right arm across the front passenger seat to search his glove box. He performed this reach-and-search action three times while rummaging through the glove compartment's contents. Notably—and relevant to Mr. Nabors' subsequent claim that his right shoulder was dislocated at the time of this encounter—Mr. Nabors performed this entire searching sequence without any apparent pain or difficulty. Jt. Ex. 1 at 4:38:45–4:39:30; Jt. Ex. 3 at 4:38:45–4:39:30. Unable to find the card, Mr. Nabors telephoned his stepdaughter to ask where she kept the Impala's proof-of-insurance. As he was doing so, North Chicago police dispatch reported to Officer Mueller that Willie Payne, Jr.'s driver's license was suspended.

Officer Mueller promptly asked Mr. Nabors—who was still purporting to be Willie Payne, Jr.—to get out of the car.[6]

The principal focus of Mr. Nabors' complaint is what transpired over the next 40 seconds or so, which can be seen on the body camera video recordings from Officers Mueller, Laracuente, and Nixon. *See* Jt. Ex. 1 at 4:41:09-49; Laracuente Body Camera ("Jt. Ex. 2") at 4:41:09-49; Jt. Ex. 3 at 4:41:09-49.

Mr. Nabors complied with Officer Mueller's request to exit his vehicle while continuing to talk with his stepdaughter about her insurance card. As Mr. Nabors stood up, Officer Mueller instructed him to put both hands on the roof of the car. Officer Mueller then took Mr. Nabors' right arm and extended it to the roof of the car, turning Mr. Nabors to face the car. Mr. Nabors assumed and maintained this position without any apparent pain or difficulty. With his left hand, meanwhile, Mr. Nabors continued to hold his cell phone against his ear.

At this time, Officer Laracuente approached Mr. Nabors from the rear to assist Officer Mueller with handcuffing Mr. Nabors. While Officer Laracuente was gripping Mr. Nabors' right wrist and proceeding to position Mr. Nabors' right arm behind his back, Mr. Nabors momentarily resisted and pulled-away (without breaking Officer Laracuente's grip) while sternly advising Officer Laracuente that his right shoulder was dislocated. Jt. Ex. 3 at 4:41:16.[7] At trial,

---

[6] Not until after Mr. Nabors' arrest was complete did the officers discover his true identity. During a search of the Impala, Officer Laracuente recovered Mr. Nabors' driver's license from a wallet found underneath the front passenger seat. Laracuente Body Camera at 4:43:18–4:44:16. Even then, Mr. Nabors claimed that Gary R. Nabors was his brother. Jt. Ex. 1 at 4:44:00-44, 4:45:55–4:46:06.

[7] It bears noting that, other than Mr. Nabors' testimony, there is scant evidence that he actually had a dislocated shoulder. There is no testimony from any corroborating witness and no medical records confirming the dislocation (the only medical record presented is an entry documenting an office visit at which Mr. Nabors complained of shoulder pain; there is no record of any diagnosis or determination that the shoulder was dislocated, Pl. Ex. 2 at 1). To the contrary, Mr. Nabors' right shoulder was X-rayed just two hours after the incident, and the X-

Mr. Nabors testified that he asked Officer Laracuente to handcuff him with his hands in front of his body because it was painful to be handcuffed with his hands behind his back, but review of the video evidence shows that he made no such request.

When Mr. Nabors told Officer Laracuente that his shoulder was displaced, Officer Laracuente stopped, politely acknowledged Mr. Nabors' report, and responded, telling Mr. Nabors: "Okay. Put your arm behind your back. I don't want to mess up your shoulder." *Id.* at 4:41:19-28. Although Mr. Nabors' right arm was then positioned behind his back, Mr. Nabors' continued use of his cell phone with his left hand was preventing Officer Mueller from handcuffing Mr. Nabors. So, Officer Laracuente instructed Mr. Nabors to "get off the phone, please," *id.* at 4:41:28-31, while reaching in front of Mr. Nabors for the phone. Officer Laracuente repeated the instruction when Mr. Nabors did not comply. At that point, Mr. Nabors turned toward Officer Laracuente and bumped into him slightly as Mr. Nabors angrily protested, "Let me hang the phone up, man." Jt. Ex. 1 at 4:41:28-31.

With that, Officer Laracuente's demeanor shifted from respectful to aggressive. Jt. Ex 3 at 4:41:32. Placing his right hand on the left side of Mr. Nabors' neck, Officer Laracuente pushed Mr. Nabors' head downwards, pressing Mr. Nabors' torso against the Impala. *Id*. Officer Mueller then attempted to move Mr. Nabors' left arm into position to be cuffed; as he did so, Mr.

---

rays showed no dislocation or other injury to the shoulder. Pl. Ex. 1 at 16. Moreover, the videos show that, until Officer Laracuente began to handcuff him, Mr. Nabors had exhibited no difficulty or pain in moving his right arm. He used it freely and repeatedly to reach into the glove box and he held it on the roof of the car with no issue. Further, during the effort to handcuff Mr. Nabors after he disregarded the instructions to get off the phone, Mr. Nabors did not display any sign of pain or make any protest that the officers were causing him pain of any sort. In light of this contradictory evidence and the many falsehoods that Mr. Nabors provided during this episode and during his testimony at trial, the Court cannot credit Mr. Nabors' claim that he had a dislocated shoulder on September 3, 2018. Still, the officers were not privy to all of this information, so the Court's evaluation of their conduct is not based on a conclusion that the officers were entitled to ignore Mr. Nabors' claim as unfounded.

Nabors pulled away, prompting Officer Mueller to tell him to "stop." *Id.* at 4:41:31-34; Jt. Ex. 1 at 4:41:31-34. Only after Officer Nixon (who was standing nearby) removed the cell phone from Mr. Nabors' left hand and Officer Mueller shifted his grip on Mr. Nabors' arm was Officer Mueller able to place a handcuff on Mr. Nabors' left wrist. Jt. Ex. 3 at 4:41:34-46. As he did so, Officer Laracuente leveraged Mr. Nabors' right wrist upward into a position necessary for Officer Mueller to attach both handcuffs to Mr. Nabors. *Id.* Both Officers Mueller and Laracuente then released their physical hold on Mr. Nabors. *Id.* at 4:41:47. The entire period in which Officers Mueller and Laracuente were applying physical force to Mr. Nabors lasted approximately 15 seconds. *Id.* at 4:41:32-47. Throughout this sequence and as he was being handcuffed, Mr. Nabors repeated several times that he was "going to the Mayor on this," to which Officer Laracuente responded, "Trying to be polite here." *Id.* at 4:41:35-39.

     Mr. Nabors' account at trial of the officers' actions was substantially embellished. Most significantly, Mr. Nabors' claim that the officers banged his head into the roof of the car causing him to lose a tooth is not credible. He has adduced no evidence to support the claim other than his own testimony which, in view of the other prevarications Mr. Nabors made to the officers during the stop and during his testimony at trial, the Court does not credit. His claim is also belied by the video evidence that shows Mr. Nabors raising his head and continuing to talk without any difficulty as the officers worked to cuff his wrists. Moreover, Mr. Nabors never reacted in a manner consistent with someone who had just had a front tooth forcefully knocked out; Mr. Nabors said nothing to that effect at the time and the video evidence shows no blood or saliva on Mr. Nabors' face. Instead, the evidence merely shows Mr. Nabors repeatedly advising the officers of his plans to report their conduct to the Mayor. Further, the records of his post-arrest examination at the hospital show he made no complaint of having lost a tooth or suffered

any sort of injury to his mouth. Pl. Ex. 1 at 5-7. The Court cannot credit Mr. Nabors' head-banging claim.

Additionally, at no point after advising Officer Laracuente that his shoulder was dislocated did Mr. Nabors indicate that he was in pain. Jt. Ex. 1 at 4:41:47–4:42:45; Jt. Ex. 3 at 4:41:47–4:42:12. At trial, Mr. Nabors testified that his shoulder popped while Officer Laracuente maneuvered his right arm into position to cuff. This pop, according to Mr. Nabors, prompted Officer Laracuente to release him and walk away. But again, the video evidence belies this claim. The video does not reveal an audible pop nor does it show Officer Laracuente reacting to one. Instead, it shows that Mr. Nabors does not flinch or wince or otherwise react to a purported shoulder pop that was supposedly loud enough for Officer Laracuente to hear.

Rather than experiencing significant pain, Mr. Nabors appeared to be focused exclusively on the news—reported to him by Officer Laracuente during the disengagement—that his driver's license (actually his brother's) was suspended. Jt. Ex. 1 at 4:41:47–4:42:15. It was not until a minute after the handcuffing, as Mr. Nabors was sitting down within Officer Mueller's patrol vehicle, that Mr. Nabors first expressed any discomfort with his right shoulder. Jt. Ex. 1 at 4:42:47. Thirteen minutes later, after the booking process was well underway at the police station, Mr. Nabors then reported to Officer Mueller that his shoulder was pulled out of its socket and required medical attention. *Id*. at 4:55:34. The records of his examination at the hospital, however, do not indicate that his shoulder was dislocated.

At trial, Mr. Nabors alleged additional mishandling by the police during his booking, his escort to and from the hospital (to evaluate his shoulder), and his first overnight stay with the North Chicago police. Most of these allegations are trivial complaints of discomfort associated with the inconvenience of handcuffs. *E.g.*, Jt. Ex. 1 at 6:03:30-34, 7:16:42–7:17:01. The Court

7

finds them frivolous, and as such, it serves little purpose to re-chronicle them here (they also did not warrant mention in Mr. Nabors' SAC). As for the allegation associated with Mr. Nabors' overnight stay in the holding cell at North Chicago's police station, he complains that he was deprived of his shoulder sling, but there is no evidence that either of the defendant officers were responsible for that decision. This allegation does not involve the named defendants and is therefore irrelevant.

Mr. Nabors also testified that Officer Mueller—despite knowing of Mr. Nabors' right shoulder injury—pushed and forcibly grasped Mr. Nabors' right shoulder during their departure from the hospital where Mr. Nabors received a medical evaluation of his right shoulder on the day of the arrest. SAC ¶ 18. This is another embellishment rebutted by the video evidence, which reveals a different account: In order to direct Mr. Nabors out of the hospital, Officer Mueller placed his hands on Mr. Nabors' elbows and escorted him by assuming a position immediately behind and to the right of Mr. Nabors. Jt. Ex. 1 at 7:17:14-20.[8] So, Officer Mueller was walking just behind Mr. Nabors' right shoulder when—despite three verbal commands from Officer Mueller to continue walking—Mr. Nabors inexplicably stopped in place. *Id.* at 7:17:18-33. The so-called "push," then, was not a strike from Officer Mueller; rather, it was the result of Mr. Nabors' physical resistance to Officer Mueller's forward movement. And the only time Officer Mueller "grasped" Mr. Nabors was when Officer Mueller grabbed Mr. Nabors' *left* arm after Mr. Nabors quickly spun to the left, turning 180 degrees away from Officer Mueller. *Id*. In short, Mr. Nabors' post-arrest claims that the defendant officers continued to inflict pain by disregarding his shoulder injury are baseless.

---

[8] At trial, Officer Mueller explained this positioning as a standard police technique designed to minimize the risk of a detainee accessing his police sidearm (Officer Mueller holsters his sidearm on his right hip). No contrary evidence was presented.

## DISCUSSION

Claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other "seizure" of a person are analyzed under the Fourth Amendment's "reasonableness" standard. *Graham*, 490 U.S. at 395. The "reasonableness" of a particular use of force is judged from the perspective of a reasonable officer on the scene. *Id*. at 396. An officer's use of force is unreasonable if, judging from the totality of circumstances at the time of the arrest, the officer uses greater force than reasonably necessary to make the arrest. *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009). "Such an analysis is inherently fact-dependent, requiring consideration of such factors as the severity of the crime at issue, whether the person posed an immediate threat to the safety of the officers or others, and whether the person was actively resisting the officers." *Williams v. Ind. State Police Dep't*, 797 F.3d 468, 472–73 (7th Cir. 2015) (citing *Graham*, 490 U.S. at 396).

In evaluating the merit of Mr. Nabors' excessive force claim, four factors discussed at trial are determinative of whether Officer Mueller's and Officer Laracuente's actions were objectionably reasonable: (1) the presumptive danger Mr. Nabors presented to the officers; (2) Mr. Nabors' cooperation; (3) the urgency of the arrest; and (4) the amount of physical force used by the officers. Consideration of these factors convinces the Court that the force employed by the defendant officers was objectively reasonable.

**I. Presumptive Danger**

At the time of his arrest, Mr. Nabors was 57 years old, 5'7" tall, and 145 pounds. He argues that his diminutive stature did not impose a threat to the arresting officers. He also argues

9

that his crime—driving on a suspended license—did not suggest that he was dangerous,[9] and that the presence of five police officers on the scene further mitigated any danger the defendant may have posed to the arresting officers.[10] Taken together, Mr. Nabors' argument is that his arrest should have been viewed as a low-risk event that did not warrant a significant use of force.

The Court agrees that Mr. Nabors does not project an intimidating physical presence. He is not, however, a feeble old man. Plainly, his physical presence is unexceptional. The Court finds no cause for his arresting officers to presume him to present any more or any less of a danger to themselves than the average arrestee. The Court further finds no cause to discredit Officer Mueller's and Officer Laracuente's testimony regarding the inherent risk involved with even the most banal, run-of-the-mill arrests. *See also Schmidt v. Washington*, 713 N.E.2d 1266, 1268 (Ill. App. Ct. 1999) ("[A]ll police officers face the inherent risk of being injured by a suspected criminal and his cohorts in an attempt to place him under arrest. . . . [T]he risk of being injured by a violent arrestee is a risk inherent in the work of a police officer every time an arrest is made."). The fact that Mr. Nabors was not being arrested for a violent offense does not eliminate the possibility that he may have reacted violently to his arrest. *See, e.g., Smith v. City of Chicago*, 242 F.3d 737, 744–45 (7th Cir. 2001) (suspect's refusal to pull-over for twelve blocks after committing minor traffic violation justified police in using a higher degree of force in arrest).

---

[9] In making this point, Mr. Nabors actually emphasized his provision of false identification, but the officers did not determine that Mr. Nabors was not Willie Payne, Jr., until after they had arrested him for driving on a suspended license. The distinction makes little difference, however; neither crime is typically associated with violent conduct.

[10] The three police officers previously identified—Defendant Officers Mueller and Laracuente and Officer Nixon—were the only officers to take part in the actual arrest of Mr. Nabors. However, two additional officers responded to the scene.

Further, while Mr. Nabors may not have been physically imposing, the officers were not required to assume that he had no ready access to a weapon, either on his person or in his car, and it was reasonable to handcuff Mr. Nabors to minimize that risk. *See United States v. Tilmon*, 19 F.3d 1221, 1228 (7th Cir. 1994) (describing handcuffing as a "quite acceptable" means to protect officer and public safety even in the context of an investigatory stop). Moreover, given Mr. Nabors' combative attitude, the officers also had no basis to disregard the risk that Mr. Nabors' might be suffering from mental health issues that could cause him to act irrationally and aggressively. *See Migliore v. Winnebago Cty.*, 321 N.E.2d 476, 479 (Ill. App. Ct. 1974) ("The belligerent attitude of the plaintiff was sufficient basis for the use of handcuffs."). That risk was real in this case, as medical records introduced by the plaintiff document that Mr. Nabors has previously been diagnosed with bipolar disorder and has previously self-reported an inability to control his anger. Pl. Ex. 2 at 7. And, indeed, it was Mr. Nabors' agitation at the officers' attempts to handcuff him that precipitated Officer Laracuente's use of additional force to complete the handcuffing process.[11]

Finally, if more officers responded to Mr. Nabors' arrest than were necessary as Mr. Nabors claims, that is a determination only possible with the aid of hindsight. And notwithstanding the presence of two unneeded police officers on the scene, the combined efforts of three officers were needed to compel Mr. Nabors to comply with the handcuffing process. In any event, and as discussed further below, that the arresting officers did not need to employ still

---

[11] Further illustrating the risks faced by the officers are the threats that Mr. Nabors made to Officer Mueller following the arrest on his way to the hospital, *id.* at 5:02:21; at the hospital, *id.* at 7:18:28 ("Your days are numbered, boy."); and on return to the police station from the hospital, *id.* at 7:19:38–7:20:01 ("I'm gonna to fuck you up."; "Dead man walking."; "I don't give a fuck what I gotta do but I'm gonna get you; you can count on that, cracker."). The officers could not take these specific threats into account when assessing the danger posed by Mr. Nabors at the time of the arrest—he had not yet made them—but they serve to show that the officers' concerns about Mr. Nabors combative attitude were not fanciful.

more force against Mr. Nabors may be attributed, at least in part, to the presence of additional officers on the scene.

The Court therefore concludes that the arrest of Mr. Nabors did pose some risk to the officers.

## II. Mr. Nabors' Cooperation

Officers Mueller and Laracuente testified at trial that their conduct was justified by the fact that Mr. Nabors resisted arrest. This characterization is inadequate without examining the nature and degree of resistance offered. Whether an arrestee actively resists arrest is a touchstone of the *Graham* analysis. *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 524 (7th Cir. 2012). Yet there is an important distinction between active resistance and passive refusal to move or follow lawful commands. *Id.* at 525; *Turner v. City of Champaign*, 979 F.3d 563, 569 (7th Cir. 2020). "[P]assive noncompliance [is] of a different nature than the struggling that we have found warrants escalation of force." *Phillips* 678 F.3d at 525; *see also Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) ("[T]he law is clearly established that police officers cannot use 'significant' force on suspects who are only passively resisting arrest."). *Compare Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) (no evidence suggesting that the plaintiff "violently resisted" officers even if plaintiff refused to release arms for handcuffing), *with Est. of Phillips v. City of Milwaukee*, 123 F.3d 586, 592-93 (7th Cir. 1997) (officers could tackle, handcuff, and hobble a detainee who continued to struggle and kick throughout).

That said, a minimal amount of force may be used to affect the arrest of nonresisting or passively resisting suspects. *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 732 (7th Cir. 2013); *Phillips* 678 F.3d at 525 (passive resistance may require minimal use of force); *Smith v. Ball State Univ.*, 295 F.3d 763, 766–67, 770 (7th Cir. 2002) ("straight arm bar" technique used to

12

extract noncompliant arrestee from vehicle was not excessive despite causing bruises to face and head of arrestee). Officers "are entitled to graduate their response to meet the demands of the circumstances confronting them." *Smith*, 295 F.3d at 770.

On the whole, the evidence establishes that the resistance Mr. Nabors offered was somewhat, but not entirely, passive. The officers describe—and their body camera videos clearly show—Mr. Nabors tensing his right arm muscles and pulling away from Officer Laracuente at the moment Officer Laracuente first takes hold of Mr. Nabors' right wrist. Jt. Ex. 3 at 4:41:16. But this was not, as the officers maintain, tantamount to an attempt by Mr. Nabors to get away from Officer Laracuente. Mr. Nabors' arm motion was momentary and mild enough for Officer Laracuente to maintain his grip on Mr. Nabors' wrist. *Id*. Such a minor, reflexive movement would be reasonable—indeed expected—from a person possessing a dislocated shoulder, which Mr. Nabors claimed to possess. Mr. Nabors made that claim known to Officer Laracuente while he was pulling his arm away. *Id*.

By contrast, Mr. Nabors' non-compliance with Officer Laracuente's direction to get off the phone cannot be dismissed as merely passive resistance. His angry retort to Officer Laracuente—"let me hang up the phone, man"—was accompanied by a turn of his torso that caused him to bump into Officer Laracuente's chest; and it was that contact that triggered Officer Laracuente to escalate his use of force as an aid to handcuffing Mr. Nabors. Further, the video clearly shows that from that point forward, Mr. Nabors resisted the cuffing process: Officer Mueller struggled to get Mr. Nabors' left arm behind his back, prompting a command to Mr. Nabors to stop resisting; this compelled Officer Nixon to intervene and remove the cell phone from Mr. Nabors' left hand; and all the while, Officer Laracuente remained engaged in a physical effort to retain Mr. Nabors' right forearm behind his back. As Officer Nixon testified,

13

rather than comply with the officers, Mr. Nabors was attempting to do what Gary Nabors wanted to do. Given this resistance, it was reasonable for the officers to use force to control Mr. Nabors' arms and secure the handcuffs. "Some force is necessary in placing a prisoner in restraints." *Caffey v. Maue*, 679 F. App'x 487, 491–92 (7th Cir. 2017) (Eighth Amendment context; finding that "no reasonable trier of fact could conclude that [officer] used excessive force by pressing [prisoner's] head against the bus window while shackling his legs").

Mr. Nabors' actions must also be viewed in the context of his general attitude and other conduct during the stop: it was not irreproachable. From the outset of their interaction, Mr. Nabors maintained a bellicose attitude with the officers. *See, e.g.*, Jt. Ex. 1 at 4:39:31-55. He was accusatory, argumentative, profane, and at various times yelled directly at the officers (including once at Officer Laracuente just prior to the altercation). Jt. Ex. 3 at 4:41:28. Mr. Nabors admitted at trial that he was upset and used inappropriate language with the officers. None of this, of course, would absolve a police officer for using excessive force. *Cf. Abbott*, 705 F.3d at 715 ("Words alone seldom if ever are sufficient to constitute an assault; rather, there must be an accompanying gesture that is either inherently threatening or made so by the accompanying words."). It does, however, belie any notion that Mr. Nabors was a peaceful and cooperative participant in his arrest. Thus, from the perspective of Officers Mueller and Laracuente, there was a risk that Mr. Nabors' hostility would erupt into more active physical resistance.

The Court therefore concludes that it was reasonable for the officers to use some minimal degree of force to overcome the resistance offered by Mr. Nabors.

**III. Urgency of Arrest**

Mr. Nabors' cross-examination of the defendant officers suggests an argument that the non-violent nature of Mr. Nabors' offense combined with the relative security of the arresting

14

location and the presence of five officers on scene provided no impetus to expedite the arrest on account of officer safety. In other words, Officers Mueller and Laracuente could have disengaged from Mr. Nabors in response to his uncooperative conduct and allowed the situation to de-escalate before resuming their arrest. Instead, so the argument would go, the officers over-compensated with aggressive tactics to secure Mr. Nabors in handcuffs.

The point fails to persuade. There is no dispute that the police had probable cause to arrest Mr. Nabors once Officer Mueller received word that "Willie Payne, Jr." was driving on a suspended license, and the Court is aware of no precedent holding that once a police officer asserts his or her legal authority to initiate an arrest, it is anything but appropriate to see the arrest to completion. At the time of this incident, the officers were attempting to handcuff Mr. Nabors before frisking him. As noted above, they did not know whether he had access to a weapon or whether he had any mental health issues that might manifest in aggressive or violent behavior. Indeed, prolonging an arrest scenario increases the risks to the officers and to the public (here, the arrest occurred in the parking lot of a liquor store). *See generally Michigan v. Summers*, 452 U.S. 692, 702–03 (1981) ("The risk of harm to both the police and [others] is minimized if the officers routinely exercise unquestioned command of the situation."); *Muehler v. Mena*, 544 U.S. 93, 100 (2005) ("In . . . inherently dangerous situations, the use of handcuffs minimizes the risk of harm to both officers and [others]."). There is no cause to conclude that the officers violated Mr. Nabors' Fourth Amendment rights by depriving Mr. Nabors the opportunity to elevate his conduct from unruly to something more dangerous.

**IV. The Amount of Physical Force Used by the Officers**

Among the circumstances presented to the Court for consideration, no factor weighs as heavily as the amount of physical force actually used by Officers Mueller and Laracuente during

15

the arrest. The case specifically turns on whether the restraint of Mr. Nabors during the 40-second interval it took to handcuff Mr. Nabors was excessive. Central to Mr. Nabors' claim is that Officer Laracuente intentionally twisted Mr. Nabors' right, dislocated shoulder and then banged Mr. Nabors' face into the roof of the Impala, dislodging a tooth. SAC ¶ 13.

The Court's assessment of those claims was benefited by three police body camera video recordings of the altercation which collectively show, with clarity, the conduct in question. As for the alleged arm-twist, Officer Laracuente simply guided Mr. Nabors' right arm into the appropriate handcuffing position behind Mr. Nabors' back. Jt. Ex. 2 at 4:41:14-27; Jt. Ex. 3 at 4:41:17-27. No force was exerted on the arm save for the force necessary to countervail Mr. Nabors' own pull-away. This pull-away occurred before Mr. Nabors advised Officer Laracuente about his shoulder injury. Jt. Ex. 2 at 4:41:15. The only remarkable facet of Officer Laracuente's conduct at this moment was his attentiveness to Mr. Nabors' professed injury. Despite Mr. Nabors' hostility up to that point, Officer Laracuente politely acknowledged Mr. Nabors' warning and assured him through words and slow, measured movements that he intended to minimize movement of Mr. Nabors' shoulder. Jt. Ex. 3 at 4:41:20-31.

As for what came next, what the evidence shows of the force employed against Mr. Nabors is that for a period of about 15 seconds, Mr. Nabors was held against the side of the Impala by the two defendant officers while they tried to position his arms behind his back so that he could be handcuffed. Mr. Nabors resisted this process; and so, the officers had to use some force to position his arms where they could be cuffed. The video footage shows that the officers were not twisting Mr. Nabors' arms any more than was necessary to apply the handcuffs and that as soon as Mr. Nabors was cuffed, the officers released their hold on him. In addition, the video shows that Officer Laracuente placed his right forearm against the back of Mr. Nabors' neck as a

16

means of further limiting Mr. Nabors' freedom of movement. As noted above, no head-banging occurred, and the video shows that Mr. Nabors' head was not held down against the roof. The officers did not hit or choke Mr. Nabors; they did not tackle him or take him to the ground; they did nothing to gratuitously cause him any pain (nor did he complain that he was in pain during the brief struggle). They briefly applied enough force to enable them to quickly complete the handcuffing of Mr. Nabors; the degree of force they used was appropriate for that task.

It is fair to say that Officer Laracuente lost his temper when Mr. Nabors failed to immediately comply with his directions to get off the phone. But while Officer Laracuente's ephemeral emotional agitation may warrant some criticism in hindsight—one would be hard pressed to describe Officer Laracuente as being polite or respectful after Mr. Nabors failed to comply with his commands to get off the phone—it did not translate into the use of objectively inappropriate force. This conclusion is bolstered by the complete lack of evidence supporting Mr. Nabors' claims of harm. Although an excessive force violation may arise absent physical injury to the assailed, *see Briggs v. Marshall*, 93 F.3d 355, 359 (7th Cir. 1996), the absence of evidence of bodily harm is relevant to assessing the degree of force used. *Cf. Hudson v. McMillian*, 503 U.S. 1, 8 (1992); *see also, e.g., Holm v. Village of Coal City,* 2008 WL 4371293, *5 (N.D. Ill. Sep. 19, 2008) (claims that police used excessive force when they "yanked" and "pushed" arrestee toward patrol car when arrestee would not advance toward the car). Here, the entirety of the video evidence suggests Mr. Nabors was in little, if any, physical pain—not prior to the arrest (*e.g.*, as Mr. Nabors freely used his right arm to search the Impala's glove compartment) nor after. Following the altercation, one would expect Mr. Nabors to show some signs of continuing pain or injury, but none are evident. Tellingly, in the aftermath of a scrum in which Mr. Nabors alleges that his head was slammed against the roof of a car, a tooth was

17

knocked out, and his displaced shoulder was wrenched behind his back, the extent of medical treatment Mr. Nabors required one hour after his arrest at the hospital was—simply—Ibuprofen. Pl. Ex. 1 at 7.

Based on the direct evidence of the officers' actions and the dearth of evidence supporting Mr. Nabors' injury claims, the Court finds the amount of physical force used by Officers Mueller and Laracuente to have been modest and of brief duration such that it did not cause substantial pain or injury to Mr. Nabors. The force used by the officers, while not *de minimis*, was brief and tailored to the objective of handcuffing Mr. Nabors

\* \* \*

Based largely on police body camera video recordings which collectively provide a clear depiction of Mr. Nabors' arrest and contradict much of Mr. Nabors' testimony, the Court finds that Officer Mueller's and Officer Laracuente's conduct was objectively reasonable. The officers used limited physical force—and nothing more—to effectuate Mr. Nabors' arrest. The force was a proportionate response to Mr. Nabors' passive refusal to comply with the officers' instructions and active resistance to their efforts to handcuff him. This conclusion applies to the plaintiff's post-arrest complaints as well. And even if Officer Laracuente's demand for immediate compliance was not absolutely necessary in hindsight, the Fourth Amendment standard governing the use of force is objective reasonableness, not necessity. On this point, *Graham*'s guidance is instructive:

> Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

18

490 U.S. at 396–97 (internal quotations removed). Judgment is entered for the defendants.[12]

Date: November 22, 2021

John J. Tharp, Jr.
United States District Judge

---

[12] The City of North Chicago is named as a defendant in the SAC and has never been dismissed from the case, but the plaintiff appears to have abandoned any claim against the city. The parties' Final Pretrial Order, ECF No. 66, does not include the City in the listing of defendants, and the plaintiff presented no evidence to support a theory of municipal liability. In any event, as the claims against the individual defendants fail, so too does any claim against the city. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016) ("If the plaintiff's theory of *Monell* liability rests entirely on individual liability, . . . negating individual liability will automatically preclude a finding of *Monell* liability.").